John G. McCarthy (JM-2635)
BAINTON McCARTHY LLC
*Attorneys for Plaintiff*
English Boiler & Tube, Inc.
26 Broadway, Suite 2400
New York, New York 10004
(212) 480-3500

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

| | |
|---|---|
| ENGLISH BOILER & TUBE, INC., : | |
| Plaintiff, : | 08 Civ. 3605 (JGK) (DFE) ECF Case |
| - against - : | **DECLARATION OF RICHARD E. ENGLISH** |
| OPTIMIRA ENERGY, INC., : | |
| Defendant. : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

RICHARD E. ENGLISH, pursuant to 28 U.S.C. § 1746, declares as follows:

1.     I am President of the Plaintiff, English Boiler & Tube, Inc. ("English

Boiler"), and have held that position for the past year. Prior to that, I was Vice-President of

Operations for approximately twelve years. I am familiar with the facts and events concerning

both the 2004 Purchase Contract and the 2006 Settlement and Release Agreement between

English Boiler and Optimira Energy, Inc. ("Optimira", formerly "Vestar, Inc."), and I make this

affidavit in support of English Boiler's motion for damages at inquest against defaulting

defendant Optimira.

2.     English Boiler is one of the leading Industrial Package Watertube boiler

manufacturers in North America. English Boiler designs and manufactures reliable and efficient

steam boilers and high temperature hot water generators for industrial, commercial, and

institutional customers throughout the world. English Boiler is a complete service organization

and employs a staff of engineers and service technicians dedicated to manufacturing boilers to the customer's specifications.

3.      English Boiler is a Virginia corporation with its principal place of business at 2890 Seven Hills Boulevard, Richmond, Virginia 23231.

4.      On or about June 1, 2004, English Boiler entered into a purchase contract with Optimira (the "Purchase Contract"). Plaintiff's Exhibit 1 is a true and correct copy of the Purchase Contract.

5.      I reviewed and authorized Joe Gallagher to sign the Purchase Contract on English Boiler's behalf.

6.      Optimira told us, and as the Purchase Contract reflects, in early 2004, Rohm and Hass Company ("Rohm") contracted with Optimira to design, implement and construct one boiler house each for two plant facilities located in or around Pittsburgh, Pennsylvania. *See* Plaintiff's Exhibit 1 at 1.

7.      Because English Boiler has expertise in the design and manufacture of boiler systems, Optimira approached English Boiler to discuss and negotiate a subcontract for boilers that would satisfy Rohm's requirements.

8.      As set forth in the Purchase Contract, English Boiler promised to manufacture two 700 HP and two 300 HP packaged firetube boiler modules with all auxiliary equipment. In laymen's terms, that means English Boiler agreed to design and construct four separate boiler systems which included all the necessary component parts.

9.      As set forth in the Purchase Contract, in consideration for the boiler system, Optimira promised to pay English Boiler $1,507,640.

10.    Payment of the $1,507,640 was to be made in installments invoiced when English Boiler reached the following production and delivery benchmarks:

  a.    15% of the Contract Price was to be invoiced and paid upon receipt of the Order;

  b.    25% of the Contract Price was to be invoiced and paid upon issue of submittal drawings;

  c.    25% of the Contract Price was to be invoiced and paid upon receipt of boiler shell materials at plant;

  d.    25% of the Contract Price was due upon notification of readiness for shipment;

  e.    10% of the Contract Price was due with acceptance of the boiler systems, not to exceed sixty days from ship date.

11.    Pursuant to the Purchase Contract, English Boiler also agreed that once the boilers were up and running it would provide 24 days of startup and training to the boiler operators at the Pittsburgh plants for an additional fee of $38,400.

12.    The Purchase Contract also contained a clause which required that all modifications to boiler specifications had to be submitted in a change order agreed to in writing by both parties.

13.    Shortly after the Purchase Contract was executed, English Boiler began manufacturing the requested boilers.

14.    In the ordinary course of English Boiler's business, English Boiler creates and maintains a customer ledger for each of its customers.  The customer ledger is a report created by a person with knowledge of events, made at or near the time of event, in which records, including invoices and payments, are summarized.  English Boiler relies on its customer ledgers in the ordinary course of its business to accurately bill its customers.  Plaintiff's Exhibit 2 is a true and correct copy of the English Boiler Customer Ledger for Optimira.

3

15.     As the Customer Ledger reflects, on or about June 23, 2004, after English Boiler sent Optimira the submittal drawings, and pursuant to the payment schedule in the Purchase Contract, English Boiler invoiced Optimira for the first two payments, the 15% of the purchase price due upon receipt of the order, and the 25% of the purchase price due upon issue of submittal drawings. (Pl. Ex. 2.)

16.     On or about July 14, 2004, Optimira made its first payment on the Purchase Contract in the amount of $226,146. (Pl. Ex. 2.) This amounted to 15% of the contract price which was invoiced upon receipt of the order.

17.     On or about July 28, 2004, English Boiler sent the boiler shells to the plants. Pursuant to the payment schedule in the Purchase Contract, English Boiler invoiced 25% of the purchase price which was due upon receipt of boiler shell materials at the Pittsburgh plant. (Pl. Ex. 2.)

18.     On or about August 2, 2004, Optimira submitted, and English Boiler agreed to, the first Change Order which requested larger brine tanks. The Change Order was agreed to in writing by both parties, and I signed the Change Order on English Boiler's behalf. The modification added an additional $6,700 to the Purchase Contract price. Plaintiff's Exhibit 3 is a true and correct copy of the August 2, 2004 Change Order.

19.     On or about August 9, 2004, Optimira submitted, and English Boiler agreed to, the second Change Order which requested revisions to the deaerators. The Change Order was agreed to in writing by both parties, and I signed the Change Order on English Boiler's behalf. The modification added an additional $8,200 to the Purchase Contract price. Plaintiff's Exhibit 4 is a true and correct copy of the August 9, 2004 Change Order.

20.    As the Customer Ledger reflects, on or about August 20, 2004, Optimira made its second payment on the Purchase Contract in the amount of $376,910. (Pl. Ex. 2.)  This amounted to 25% of the contract price which was invoiced upon issuance of submittal drawings.

21.    On or about August 31, 2004, Optimira submitted, and English Boiler agreed to, the third and final Change Order which requested automated mud drum blowdown valves on each boiler.  The Change Order was agreed to in writing by both parties, and I signed the Change Order on English Boiler's behalf.  The modification added an additional $3,100 to the Purchase Contract price.  Plaintiff's Exhibit 5 is a true and correct copy of the August 9, 2004 Change Order.

22.    As the Customer Ledger reflects, on or about September 2, 2004, Optimira made its third payment on the Purchase Contract in the amount of $376,910. (Pl. Ex. 2.)  This amounted to 25% of the contract price which was invoiced upon acceptance of the boiler shell materials at Optimira's plant.

23.    As the Customer Ledger reflects, on or about February 15, 2005, Optimira made its fourth payment on the Purchase Contract in the amount of $188,455.  (Pl. Ex. 2.)  This amounted to half of the 25% of the contract price which was invoiced upon English Boiler notifying Optimira that the boilers were ready to ship.

24.    On or about February 17, 2005, English Boiler notified Optimira that the boilers were ready to ship.  Pursuant to the payment schedule in the Purchase Contract, English Boiler then invoiced 25% of the purchase price which was due upon notification of readiness for shipment.  Optimira had already paid half of this invoice. (Pl. Ex. 2.)

25.    On or about March 9, 2005, English Boiler sent Optimira an invoice for $18,000, the total price of all three Change Orders. (Pl. Ex. 2.)

26.    As the Customer Ledger reflects, on or about March 22, 2005, Optimira made its fifth payment on the Purchase Contract in the amount of $188,455. (Pl. Ex. 2.) This amounted to the other half of the 25% of the contract price that was invoiced upon English Boiler notifying Optimira that the boilers were ready to ship.

27.    As the Customer Ledger reflects, on or about April 18, 2005, Optimira made its sixth payment on the Purchase Contract in the amount of $18,000. (Pl. Ex. 2.) This amount covered the cost of the three Change Orders.

28.    In May and June, 2005, English Boiler shipped and installed the boilers and trained employees at the Rohm's Pittsburgh facilities. (Pl. Ex. 2.)

29.    Including the Change Orders and the start up and training fees, the total Purchase Contract price was $1,564,040.

30.    Optimira made six payments under the Purchase Contract totaling $1,374,876.

31.    Optimira breached the Purchase Contract by failing to pay approximately $189,164. This amount was the final 10% of the contract price plus the startup and training fee.

32.    Optimira claimed that it was withholding the payment of $189,164 as a result of back charges against the contract.

33.    When a customer of English Boiler hires another engineering firm to correct that which it deems to be a problem with a boiler system we manufactured, that customer will submit those invoices to English Boiler as back charges against the contract.

34.    English Boiler will then either accept the back charges and deduct the difference from the contract price or dispute the charges.

35.     To the best of my knowledge, Optimira never submitted invoices, work-orders or any other proof of such back charges.

36.     Optimira admitted to us that they were cash poor as a result of recently acquiring the assets and liabilities of its corporate predecessor, Vestar Inc.

37.     At my request, my employee Joe Gallagher began discussing payment plans with Optimira in an attempt to resolve Optimira's default.

38.     Joe Gallagher negotiated with Optimira, and both he and I worked out the terms of the Release Agreement with Optimira.

39.     English Boiler and Optimira resolved their dispute arising from Optimira's breach of Purchase Contract by entering into a Settlement and Mutual Release Agreement dated October 1, 2006 (the "Release Agreement"). I reviewed and signed the Release Agreement on English Boiler's behalf. Plaintiff's Exhibit 6 is a true and correct copy of the Release Agreement, dated October 1, 2006.

40.     In order to recoup at least some of the money English Boiler was owed, I agreed to accept $150,000 instead of the $189,164 due under the Purchase Contract.

41.     Pursuant to section 1 of the Release Agreement and in consideration for payments to be made thereunder, English Boiler agreed to "waive, release and covenant not to file any action in any court, administrative agency or otherwise, with respect to any matters related to or arising out of the 2004 Agreement [between Optimira and English Boiler]."

42.     Upon execution of the Release Agreement, Optimira paid English Boiler $5,000.

43.    On September 4, 2007, English Boiler invoiced Optimira for the second payment of $45,000 which was due on October 1, 2007.  Plaintiff's Exhibit 7 is a true and correct copy of the Invoice, dated September 4, 2007.

44.    Optimira did not make the second payment.

45.    My staff and I attempted to contact Optimira numerous times, but received no response.

46.    Optimira is in default of the Release Agreement.  The second payment for $45,000 is past due and payable in full to English Boiler with interest from October 1, 2007.

47.    At my request, our attorneys notified Optimira that it was in default of the Release Agreement and demanded payment of all funds remaining under the Release Agreement by December 15, 2007.  Plaintiff's Exhibit 8 is a true and correct copy of the letter our attorney sent to Optimira, dated December 15, 2007.

48.    To the best of my knowledge, Optimira did not reply to the letter.

49.    English Boiler has attempted to resolve this matter since about June 2005, when Optimira owed it $189,164 under the terms of the Purchase Contract.

50.    English Boiler has unjustly suffered as a result of Optimira's continued defaults, first on the Purchase Contract, and now on the Release Agreement.

51.    Optimira has been unjustly enriched in an amount not less than the $145,000 still due English Boiler.

52.    True and correct copies of the Plaintiff's Exhibits are attached hereto.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on August 1, 2008.

Richard E. English

## CERTIFICATE OF SERVICE

I, Michael T. Roussel, hereby certify that on August 1, 2008, I caused a true and correct copy of the foregoing *Declaration of Richard E. English* to be served upon the defendant, and upon Robert L. Mazzeo, Esq., who was copied by defendant during e-mail correspondence with our firm, addressed as follows:

Optimira Energy, Inc.
60 East 42nd Street, Suite 3405
New York, New York 10165.

Robert L. Mazzeo, Esq.
Mazzeo Song & Bradham LLP
708 Third Avenue, 19th Floor
New York, New York 10017

Dated: New York, New York
        August 1, 2008

_____
Michael T. Roussel

## PURCHASE CONTRACT

THIS PURCHASE Contract ("Contract"), made and entered into this 1st day of June 2004 ("Effective Date"), between ENGLISH BOILER & TUBE, INC. ("Seller") with a principal place of business at 2890 Seven Hills Blvd., Richmond, Virginia 23250-0218, and VESTAR, INC., a Delaware corporation ("VESTAR") with a principal place of business at 221 E. Fourth Street, Atrium II, Fifth Floor, Cincinnati, Ohio 45202 (the "Parties").

RECITALS:

ROHM AND HAAS COMPANY acting by and through its agent (*APPROPRIATE JACOBS CONSTRUCTION ENTITY*) ("OWNER") has contracted with VESTAR to design, implement, and construct two separate boiler houses that would include 2 x 700 HP and 2 x 300 HP new packaged firetube boiler modules including all auxiliary equipment at Owner plant facility locations, and;

Seller has expertise in the design and manufacture of packaged fired firetube boilers, and Seller is desirous of manufacturing the required boilers;

VESTAR and Seller desire to establish the terms, conditions and obligations pursuant to which they intend to accomplish the foregoing;

VESTAR is hereby entering into a definitive purchase contract with Seller for the purchase of the required boilers and all auxiliary equipment.

NOW THEREFORE, in consideration of the mutual agreements herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.    Terms and Conditions

This Contract shall be performed in accordance with attached **ATTACHMENT 1**, Terms and Conditions, which is incorporated herein.

2.    Scope of Work

Construct, deliver, install, inspect, start-up, and testing 2 X 700 HP and 2 X 300 HP new packaged firetube boiler modules including all auxiliary equipment, Standard Boiler Trim, Boiler Controls, Factory Assembled Boiler Feedwater System, Boiler Feedwater Pumps, Blowdown Separator, Softeners, and Weather Enclosures as described in **EXHIBIT H2**, English Boiler & Tube, Inc. Proposal EBFT-1022-04S, dated April 21, 2004, which is incorporated herein.

Should VESTAR and or Owner decide to observe factory acceptance testing, Seller shall accommodate VESTAR observing the factory acceptance testing of the Equipment. Seller will give VESTAR reasonable advance notice of when such factory acceptance testing (Seller's normal tests and inspection) will be performed (i.e., at least seven (7) days advance notice).

3.    Contract Price and Payment Terms.

Contract Price



PLAINTIFF'S EXHIBIT 1

VESTAR agrees to pay Seller **One Million, Five Hundred Seven Thousand, Six Hundred Forty dollars** ($1,507,640.00) (the "Contract Price") as VESTAR's total and exclusive consideration for performance of the Work. The Contract Price does not include sales tax. In the event this sale is not exempt from sales tax, the actual amount of sales tax due Seller will be added to the Contract Price.

The Contract Price shall not be subject to adjustment except through a Change Order agreed in writing by the Parties. Except as otherwise specifically provided in this Contract, the Contract Price is a fixed price, enforceable at such amount.

Delivery Term – Freight included to jobsite.

    Payment Terms

Payments shall be made to Seller in accordance with the following schedule:

    15% of the Contract Price will be invoiced upon receipt of Order (due upon receipt).
    25% of the Contract Price will be invoiced upon issue of submittal drawings (net 30).
    25% of the Contract Price will be invoiced upon receipt of boiler shell materials at plant (net 30).
    25% of the Contract Price is due upon notification of readiness for shipment (net 30).
    10% of the Contract Price is due with acceptance not to exceed sixty (60) days from ship date (net 30).

All payments of complete and correct invoices will be made by VESTAR by thirty (30) days after receipt of invoice, except for the initial 15% due upon receipt of order.

In lieu of any retention, Seller will open a Standby Letter of Credit, on behalf of VESTAR, for Three Hundred Thousand Dollars ($300,000). The Letter of Credit will be valid from the Effective Date until the work is inspected and accepted by VESTAR and Owner, or ninety (90) days from ship date, whichever occurs first.

If Seller fails to deliver the Work (as defined in Attachment 1 Terms & Conditions) as provided in its Purchase Contract with VESTAR and such failure constitutes an Event of Default (Event of Default shall be as defined below), and such condition has continued for 30 days following the delivery to Seller of notice of said default, VESTAR may at its sole option draw against the Letter of Credit up to the amount of US $300,000, or use alternative security arrangements and remedies to obtain payment.

"Event of Default": any one of the following would constitute an event of default on the part of Seller ("Seller Event of Default") under this Contract:

    (1)    Seller fails to comply with any other material provision of this Contract and fails to cure or remedy such default within thirty (30) days after notice and written demand are made by VESTAR to Seller to cure the same or such longer period of time as is reasonably required to cure or remedy such default;

    (2)    (i) Seller (a) institutes a voluntary case seeking liquidation or reorganization under the Bankruptcy Law, or consents to the institution of an involuntary case thereunder against it, (b) files a petition or consents or otherwise institutes any similar

proceeding in respect of Seller under any other applicable federal or state bankruptcy law, or shall consent thereto, (c) applies for, or suffers the appointment of, a receiver, liquidator, sequestrator, trustee or other officer with similar powers, (d) makes a general assignment for the benefit of creditors, or (e) admits in writing its inability to pay its debts generally as they become due; or (ii) an involuntary case is commenced seeking the liquidation or reorganization of Seller under the Bankruptcy Law or any similar proceeding shall be commenced against Seller under any other Applicable Law, and (a) the petition commencing the involuntary case is not timely controverted, (b) the petition commencing the involuntary case is not dismissed within ninety (90) days of its filing, (c) an interim trustee is appointed to take possession of all or a portion of the property, or to operate all or any part of the business of Seller and such appointment is not vacated within ninety (90) days, or (d) an order for relief is issued or entered therein; or (iii) a decree or order of a court having jurisdiction in the premises for the appointment of a receiver, liquidator, sequestrator, trustee or other officer having similar powers of Seller or of all or a part of its respective property, is entered; or (iv) any other similar relief is granted against Seller under any Applicable Law; or

(3)    If any representation or warranty of Seller set forth in this Contract shall have been false or misleading in any respect as of the Effective Date and VESTAR is materially adversely affected unless Seller has cured such breach within thirty (30) days of Seller's knowledge of the violation.

4.    Schedule

Seller is responsible for completion of construction, delivery, installation, inspection, start-up and testing of the boilers by no-later-than January 31, 2005.

5.    Subcontractors

Seller represents and warrants that it has the expertise and experience to complete the Work successfully and on a timely basis. Seller may locate and procure the goods and/or services of Subcontractors that in Seller's reasonable judgment may be necessary to complete the Work and other obligations of Seller hereunder; provided, however, that any such subcontracting shall not relieve Seller of any of its obligations, duties or responsibilities hereunder.

Relationship of VESTAR and Owner to Subcontractors.  Nothing herein or otherwise shall create any contractual relationship whatsoever between VESTAR or Owner and any Subcontractor.  VESTAR and Owner shall have no obligation to pay or to see to the payment of any moneys to any Subcontractor.  Seller shall be solely responsible, to VESTAR, Owner, and others, for the acts and omissions of its Subcontractors, and shall be solely responsible to its Subcontractors for compensation with respect to their performance of any of the Work.

Subcontracts.  All portions of the Work performed for Seller by a Subcontractor shall be pursuant to an appropriate written agreement between Seller and the Subcontractor (or between a Subcontractor and a lower-tier Subcontractor, as the case may be) which shall contain provisions that:

Preserve and protect the rights of VESTAR under this Contract with respect to the Work to be performed under the subcontract so that the subcontracting thereof will not prejudice such rights;

Recite that VESTAR, Owner, their successors and assigns, are third-party beneficiaries of the subcontract;

Allow for the assignment of such subcontract to VESTAR or Owner, their successors and assigns;

Require that all work to be performed under the subcontract is performed in strict accordance with the requirements of this Contract and the other Project Documents;

Provide VESTAR, Owner, and their representatives and governmental authorities with access to the Subcontractor's facilities to conduct inspections, observation and tests as appropriate or necessary in accordance with the provisions of this Contract; and

Require that any claims for additional costs, extensions of time, damages for delays or otherwise with respect to subcontracted portions of the Work shall be submitted to Seller, and recognize that VESTAR or Owner has no responsibilities to the Subcontractor.

Subcontractor Warranties.  Seller agrees to assign to Owner on and as of the Equipment title transfer date (or earlier, if requested by VESTAR) any and all warranties and performance guarantees provisions contained in any contract between Seller and a Subcontractor.

Subcontractor not a Third Party Beneficiary. No Subcontractor is intended to be, nor shall any Subcontractor be deemed to be, a third party beneficiary of this Contract.

IN WITNESS WHEREOF, the Parties have by their respective duly authorized officers caused this Contract to be executed and delivered as of the Effective Date.

| ENGLISH BOILER & TUBE, INC. | VESTAR, INC. |
|---|---|
| By: | By: _Donald R. Snider_ |
| Name: _Joe Gallagher_ | Name: _Donald R. Snider_ |
| Title: _Director of Project Management_ | Title: _VP - COO - Vestar_ |

**<u>LIST OF ATTACHMENTS</u>**

**<u>PURCHASE CONTRACT</u>**

**<u>Attachment 1</u> - Terms and Conditions**

**<u>Attachment 1</u> - English Boiler & Tube, Inc. Incorporated Proposal EBFT-1022-04S**

ATTACHMENT 1

**VESTAR, INC.**
**ENGLISH BOILER & TUBE, INC.**
ROHM & HAAS
BOILER PROJECT
**TERMS AND CONDITIONS**
April 15, 2004

The Contract issued to Seller by VESTAR for any of the Work described therein shall be subject to and shall incorporate the following Terms and Conditions by reference and/or attachment.

1.    <u>DEFINITIONS</u>

Wherever the following words and expressions are used in the Contract documents, it is understood that they have the meanings defined below:

　　　1.1.    VESTAR – Vestar, Inc., and its affiliates, agents, successors, and assigns.

　　　1.2.    Seller – English Boiler & Tube, Inc., including any of its subcontractors or successors, heirs and assigns undertaking the performance of Work required by this Contract or any other Work that subsequently becomes a part of the Contract by attachment or incorporation by reference hereto.

　　　1.3.    Contract - The composite of the commitments of Seller and VESTAR covering the performance of the Work. The components of the Contract are as follows, listed in their order of precedence: (1) the Contract document issued by VESTAR to Seller and amendments thereto; (2) these Terms and Conditions; (3) Seller's proposal; and (4) any industry standards as may be designated in Seller's proposal.

　　　1.4.    Work - Labor, supervision, methods, materials, Equipment, transportation, services, or other means provided by Seller pursuant to terms of the Contract.

　　　1.5.    Equipment - Collectively, all the goods identified in Seller's Proposal as being supplied by Seller under the Contract.

　　　1.6.    Representative - The designated corporate officer for VESTAR or his/her designated representative. All words and terms signifying choice, approval, decision or judgment, with reference to materials, apparatus, methods, workmanship, supervision and technical or administrative detail, shall be understood to refer to the authority exercised by the Representative, either directly or through designated representatives.

　　　1.7.    Owner – Rohm & Haas, Bristol and Croydon, and its properly authorized representatives, agents, successors and assigns.

2.    TIME OF IMPORTANCE

Time is of the essence in the completion of the Contract, and Seller agrees that Work shall be commenced and carried on at such times as may be required to meet VESTAR's schedule for performing and completing the Work. Seller declares that it has familiarized itself with the sites, with all local conditions and with all circumstances which may or are likely to affect performance and completion of the Work, and that it has allowed for such conditions in the preparation of the schedule and its bid.

3.    TERMINATION FOR CAUSE

3.1.    VESTAR may terminate the Contract, and will provide written notice of such termination and effective date, for cause in the event Seller defaults in performing thereunder or in providing VESTAR, upon written request, with adequate assurance of due performance, or if Seller breaches any material term or condition of the Contract. In the event of termination for cause, VESTAR shall not be liable to Seller for any amount otherwise payable to Seller under the Contract.

3.2.    In lieu of immediate termination in the event Seller defaults or breaches the Contract, Seller shall have thirty (30) calendar days to cure such default or breach. If Seller does not cure such default or breach, within the thirty (30) calendar days, or present a plan to cure that is satisfactory to VESTAR, within a reasonable time, then VESTAR may terminate the Contract, or any part thereof.

4.    TERMINATION FOR CONVENIENCE

VESTAR may at any time and for any reason terminate the Contract or any part thereof, for its sole convenience. In the event of termination or cancellation of the Contract by VESTAR for convenience, VESTAR shall pay Seller termination charges in accordance with this Article. Without prejudice to or waiver of any other rights under this Contract or at law or equity, the following termination schedule shall apply.

TERMINATION/CANCELLATION SCHEDULE

Should VESTAR terminated this Contract for convenience prior to completion of the contract, the following termination schedule shall apply. The numbers of days in the following table represent calendar days from the Effective Date.

30 Days : $   150,700
60 Days : $   376,750
90 Days : $   602,800
120 Days: $   979,550
180 Days: $1,356,300
Over 180 Days: 100% of contract value

Except where termination charges are designated as one hundred percent (100%) of the Contract Price, the foregoing schedule assumes all goods, in whatever stage of completion, are retained by Seller.

5.    <u>WARRANTIES OF TITLE</u>

Seller warrants that its transfer of ownership is rightful and free from any security interest or other lien or encumbrance of third parties.    Seller warrants that the goods shall be delivered free of rightful claim of any third person by way of infringement or the like of any United States patent or trademark.    Seller will defend, indemnify and hold VESTAR and Host harmless from any such claim provided prompt notice and opportunity to defend is given by VESTAR or Owner to Seller. This warranty constitutes Seller's sole responsibility for infringement claims.    VESTAR agrees to defend, indemnify and hold Seller harmless from any claim of infringement for goods designed or manufactured to VESTAR's specifications if such design, manufacture or specification constitutes the basis for such actual or alleged infringement claim.

6.    <u>WARRANTIES OF QUALITY</u>

Seller warrants the goods to be free from defects in workmanship and material used in their manufacture. This warranty will cover goods, on a unit-by-unit basis, only for claims for such defects made during the period (the "Warranty Period") which begins upon a unit first being placed in service or upon demonstrated capability to support such service and ends twelve (12) months thereafter or 18 months from ship date whichever comes first, provided:

a.    The goods are installed and used in accordance with Seller's recommended procedures; and,

b.    Any defective part or parts of the goods are returned to Seller within the Warranty Period in accordance with Seller's standard warranty claim instructions, transportation charges prepaid; and,

c.    Examination of such part or parts by Seller confirms the existence of such a defect.

Seller's obligations under this warranty are limited to repair or replacement of such defective part or parts (as Seller elects), free of charge, at Seller's place of business or repair center.  All replacement parts and repaired parts are warranted through, but not beyond, the original Warranty Period.  Seller's sole liability and responsibility, and VESTAR's sole and exclusive remedy, with respect to this warranty shall be limited to the remedies set forth above.

This warranty shall not apply to or include: (i) Normal maintenance services or adjustments; or (ii) the removal or reinstallation of warranted goods; or (iii) any goods which have been repaired or altered, other than as provided above, in any way so as to adversely affect their operation or reliability in Seller's judgment; or (iv) the effects of corrosion, erosion or wear and tear or failure occasioned by operation or condition of service more severe than specified.

Construction, fabrications, and major off-package accessories, not of Seller's manufacture are included in this warranty.

Seller warrants that the goods will conform only to those national, federal, state or local laws, ordinances, regulations, codes and standards as specifically agreed to herein.

THIS WARRANTY IS IN LIEU OF ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE. No person is authorized to give any other warranties or to assume any other liability on Seller's behalf unless agreed to in writing by Seller.

7.    INSPECTION/TESTING

Seller's normal tests and inspection of the goods may be observed by VESTAR and Owner at times scheduled for Seller's convenience and subject to Seller's standard security procedures. VESTAR and Owner may inspect the goods and review all test results and documentation prior to shipment. Performance guarantees shall be contractually demonstrated in accordance with Seller's standard specifications and factory acceptance testing and, unless good cause for rejection is shown, the goods shall be deemed accepted upon satisfactory completion of such tests and readiness for shipment.

8.    CHANGES

Requests by VESTAR for any modifications or changes to the Contract, including but not limited to, changes in specifications, quantities, delivery obligations and terms of payment, must be made in writing. All such requests are subject to Seller's written acceptance and may result in adjustments to price and/or delivery schedules.

9.    INDEMNITY

Seller hereby agrees to indemnify, hold harmless and to defend VESTAR and Owner, during the period of any applicable statute of limitation from and against any and all actions or causes of action, claims, demands, liabilities, losses, damages, or expenses of whatever kind or nature including attorneys' fees, which VESTAR or Owner, may suffer or incur by reason of bodily injury including death, to any person or persons, or by reason of damage to or destruction of any physical property arising out of or in any way connected with the Work to be provided pursuant to the Contract, or which VESTAR or Owner, may sustain or incur in conjunction with any litigation, investigation, or other expenditures incident thereto, including any suit instituted to enforce the obligation of this agreement of indemnity, to the extent caused by the negligent acts or omissions of Seller. If such actions, claims, demands, liabilities, losses, damages or expenses arise out of the joint, concurrent or successive negligence of Seller and VESTAR or Owner, each Party shall bear any loss in proportion to its respective fault.

10.    NON-WAIVER OF RIGHTS

Except as otherwise expressly agreed, limited or waived by the Parties herein, the Parties shall have all rights and remedies available to them under law with regard to the duties and obligations imposed under this Contract.

11.    LIMITATION OF LIABILITY AND ACTION

Neither VESTAR nor Seller or their affiliates, subcontractors, agents and/or employees shall be liable for any incidental or consequential damages, including but not limited to, loss of product, loss of profit (except any profit of Seller from the Order), loss of use, losses resulting from or related to downtime of the goods or the cost of replacement power or compression, howsoever caused, and whether based on warranty, contract, tort (including negligence) strict liability or otherwise. The total liability of Seller, its affiliates, subcontractors, agents and employees arising out of the performance or nonperformance of the Contract or its obligations in connection with the design, manufacture, sale, delivery, storage, erection or use of goods or the rendition of any Work or services in connection therewith, whether based on warranty, contract, tort (including negligence), strict liability or otherwise, shall not exceed in the aggregate a sum equal to the Contract price. The limitations of liability set forth in this Article shall prevail over any conflicting or inconsistent provisions contained in any documents comprising the Contract.

12.    FORCE MAJEURE

Neither Party shall be liable for any delay in performance, any nonperformance, or any other deviation in performance of its obligations, nor for any loss or damage to the goods supplied hereunder, when occasioned directly or indirectly by any cause or causes beyond the reasonable control of Seller or its subcontractors or suppliers, including, but not limited to, acts of God; acts of criminals or public enemy; war; riot; official or unofficial acts, orders, regulations or restrictions of any foreign or domestic government or agency thereof; acts of the other Party or its employees or representatives; failure, shortage or delay in Seller's usual sources of labor or material supply. Each Party shall have a reasonable extension of the time for performance when delayed by any such cause.

The following acts, events, or causes shall in no event constitute a force majeure event: (a) strike, lockout or labor dispute involving employees of the Party claiming Force Majeure or any of such Party's Representatives, or involving employees of a contractor providing services directly to such Party; or (b) any lack of profitability to a Party or other financial consideration of a Party.

Notwithstanding the foregoing, VESTAR shall not be excused by a Force Majeure event from its obligation to make any payments due to Seller for Work performed by Seller under this Contract.

13.    TAXES

Prices do not include sales, use or excise taxes, import or export duties, special financing fees, value added taxes, income or royalty taxes imposed outside the United States, consular fees, special permits or licenses or similar charges. VESTAR shall either pay any and all such taxes and charges or provide Seller with acceptable exemption certificates. If the sale is not exempt from sales tax, the actual amount of sales tax due will be added to the Contract Price and paid by VESTAR to Seller.

14.   INDEPENDENT CONTRACTOR

Seller is an independent contractor and not an agent or employee of VESTAR, and nothing contained in the Contract shall be so construed as to justify a finding of the existence of any relationship between Seller and VESTAR inconsistent with that status. Seller shall have exclusive control and responsibility for its own labor relations. Equipment operators and other VESTAR or Owner employees, agents, subcontractors, or servants assigned to assist Seller may receive temporary instructions, directions, or control from Seller but shall, at all times, be considered the employees, agents, subcontractors, or servants of VESTAR or Owner and not of Seller.

15.   COMPLIANCE WITH LAWS AND RULES

15.1.   In its performance of this Contract, Seller shall comply with all federal, state and local laws, rules, regulations and orders that are applicable to the manufacture, processing, handling, and shipping of the Equipment and performance of the Work, and that are in effect as of the Effective Date of the Contract. Seller shall abide by, and shall contractually cause all of its subcontractors to abide by any and all rules VESTAR may have in effect or hereinafter put into effect when goods are to be delivered or services are to be performed on VESTAR or Owner property.

15.2.   Seller shall obtain all required licenses and permits necessary to perform its Work under this Contract, without expense to VESTAR, and shall comply with regulations insofar as they are binding upon VESTAR.

15.3.   VESTAR shall comply with all applicable laws and regulations related to the purchase of the goods and services under the Contract including but not limited to, safety and environmental regulations, technical standards and export controls. Further, VESTAR shall not use or operate the goods in a manner other than that intended in Seller's offering without Seller's prior written consent. The goods shall not be exported or transshipped contrary to U.S. law.

16.   MECHANIC'S LIEN WAIVER

For work done in any state, VESTAR shall have the right to require Seller to furnish a complete release of liens before a progress payment or final payment is made.

So long as the VESTAR is in compliance with its payment obligations under the Contract, if the Seller, or anyone furnishing labor or materials for the Contract through the Seller, files a lien, VESTAR shall have the right to discharge the lien by appropriate legal proceedings and to retain out of any payment then due the Seller, an amount sufficient to completely reimburse and indemnify VESTAR against the expenses and losses resulting from such lien.

17.   NON-DISCLOSURE, PUBLICITY

Seller shall not disclose to any third party any information concerning VESTAR, which is obtained in the process of providing the Work under the Contract without the prior written consent of VESTAR unless such information has been made available previously to third parties by VESTAR without any restriction upon its disclosure. Such information

not to be disclosed shall include but not be limited to, the Contract price for the Work and a reference to VESTAR in Seller's advertising.

Any public relation matter, including public announcements and press releases or similar publicity, arising out of or in connection with the Work or this Contract, shall be coordinated between the Parties.  Any Party desiring to make a public announcement shall first obtain the other Party's approval of the text of any announcement, publication, or other type of communication concerning the Work or this Contract prior to the dissemination or release of the same, which approval shall not unreasonably be withheld or delayed; provided, that such approval shall not be required to the extent necessary for a Party or its Affiliates to comply with any Applicable Law (including any rules or regulations of any exchange or similar facility on which the securities of such Person may be traded).

18.    ASSIGNMENT AND DELEGATION

Neither Party shall have the right to assign, without written approval from the other Party, any rights or obligations under the Contract to any third party, except that either Party may assign its rights and obligations under the Contract to Owner. Such approval shall not be unreasonably withheld.  Notwithstanding the foregoing, in the event that VESTAR assigns any of its rights or obligations under the Contract to a third party other than Owner, VESTAR will still retain an obligation for payment of the Contract Price to Seller.

19.    APPLICABLE LAWS AND SEVERABILITY

The Contract shall be governed by and interpreted under the laws of the state of New York. If any part of a term and condition in the Contract is found to be contrary to the law governing the Contract by a court of competent jurisdiction, such term and condition shall in all other respects be and remain legally effective and binding to the full extent permissible.

20.    MERGER CLAUSE

The Contract, including any exhibits or documents incorporated herein by reference, constitutes the final written expression of all the terms and conditions of the Contract between Seller and VESTAR and is a complete and exclusive statement of those terms and conditions and supersedes all prior negotiations, representations or agreements, either written or oral, with respect to the subject matter of the Contract, except those representations relating to warranties of quality. The Contract may be modified only by a Contract Amendment or a Contract Change Notice signed by both Seller and VESTAR.

21.    USE OF SELLER'S INFORMATION

All engineering designs, data, and specifications are proprietary and shall not be disclosed or reused without Seller's prior written consent.  Engineering designs and data specifically identified and purchased as a part of the Contract shall become the property of VESTAR, and Seller assumes no responsibility for subsequent reuse.

22.    TITLE

Title to the Equipment and associated warranties shall transfer from Seller to Owner upon inspection and acceptance by VESTAR and Owner.

23.    LOSS OR DAMAGE

Until inspected and accepted by VESTAR and Owner (not to exceed 90 days from date of shipment), Seller shall have risk of loss for the Equipment, and if any loss of or damage to the Work occurs prior to such delivery, Seller shall, without cost to VESTAR, promptly make all repairs or replacements necessary to replace the Equipment in the condition required by the Contract.

24.    DISPUTE RESOLUTION

If a dispute arises between the Parties relating to the Contract, the Parties agree to use the following dispute resolution procedure prior to either Party pursuing other available remedies:

(a)    A meeting shall be held promptly between the Parties, attended by individuals with decision-making authority regarding the dispute, to attempt in good faith to negotiate a resolution of the dispute.

(b)    If, within thirty (30) days after such meeting, the Parties have not succeeded in negotiating a resolution of the dispute, it may be submitted to arbitration in accordance with the Construction Arbitration Rules of the American Arbitration Association, and judgment upon the arbitral award may be entered in any court having jurisdiction.

(c)    The request for arbitration shall be made within a reasonable time after the dispute or claim arises, and in no event after it would be barred by any applicable statute of limitations.  The cost of such arbitration shall be borne as determined by the arbitrators(s).   Unless otherwise mutually agreed, arbitration hearings shall be held in Washington DC.

25.    SHIPMENTS

25.1.   Seller will arrange for the proper delivery of all Equipment and material.  Seller shall notify VESTAR when any Equipment or material is ready for shipment, and before making any shipment, receive information as to when such Equipment or material may be received in order that undue handling at the site may be avoided. Seller shall be responsible for any additional handling costs, etc., resulting from failure to notify VESTAR.  Seller shall furnish copies of bills of lading, shipping manifests, and other papers showing shipment of Equipment and materials and/or reports of their receipt, as requested by VESTAR.

26.    HEADINGS

The headings used in the paragraphs of these Terms and Conditions are only for the reference of the Parties and shall have no meaning in the interpretation of any of the provisions herein.

27.    SUSPENSION OF ORDER

VESTAR's request for suspension of the Work must be delivered in writing to Seller, and is not effective until acknowledged in writing by Seller.  Such suspensions may result in adjustments to prices, payments and delivery schedules. The time required for subsequent completion of the Work may exceed the number of days of suspension due to Seller's scheduling constraints.  If a suspension is more than sixty (60) days in duration, VESTAR will pay Seller pro rata for the portion of the Work completed.  In the event that production-fabrication has proceeded to the point that Seller deems it cannot reasonably reschedule completion or the request for suspension is received less than sixty (60) days prior to scheduled shipment, the Work shall be completed, invoiced, and the goods placed in storage at VESTAR's expense.  Ownership of the goods shall transfer to VESTAR, and Seller shall retain a security interest therein until payment of the total Contract price is received.

28.    PAYMENTS

Payments shall be made to Seller in accordance with the schedule in the Contract.

29.    SELLER'S INSURANCE

Seller shall provide and maintain the following insurance coverage of Seller's employees, representatives, contractors, and agents during the times of their presence at the jobsite or on VESTAR or Host property with insurance companies that are acceptable to VESTAR.

29.1.   General Liability Insurance on an occurrence basis. This coverage shall include Personal Injury, Contractual Liability, and Products/Completed Operations insurance. The limit of liability shall be at least $1,000,000 combined single limit for bodily injury and property damage.

29.2.   Automobile Liability Insurance that complies with the requirements of state law. The residual liability limit shall be at least $1,000,000 combined single limit for bodily injury and property damage.  It shall cover owned, hired, and non-owned vehicles.

29.3.   Umbrella or Excess Liability Insurance that is excess over the General Liability Insurance, the Automobile Liability Insurance, and Employer's Liability Insurance.  The unimpaired limit of liability shall be at least $1,000,000 combined single limit for bodily injury and property damage.

29.4.   Worker's Compensation Insurance and Employer's Liability Insurance in an amount of not less than $100,000.

29.5.    The coverage provided by Seller will be primary to the extent Seller's negligence gives rise to a claim.

30.    ACCESS TO BOOKS AND RECORDS

Until the expiration of four years after the furnishing of Work called for by this Contract, Seller upon request shall make available to the Secretary, United States Department of Health and Human Services ("DHHS"), the U.S. Comptroller General or any of their duly authorized representatives, this Contract and all other books, documents, and records in connection with the Work provided by Seller under this Contract.  If Seller purchases such Work through a subcontract worth Ten Thousand Dollars ($10,000) or more over a twelve (12) month period with a related organization, the subcontract shall also contain a clause permitting access by said Secretary, Comptroller General, and their respective representatives to the books and records of the related organization.  This provision shall survive termination of this Contract.

### Scope of supply:

The scope for the complete turnkey project will include the following

- 2 x 700 HP, 125 PSIG operating pressure, Natural Gas/# 2 oil fired English firetube boilers model EBFT-700-150-GO-4PW with standard trim and Forney or IC low nox burners with Fireye BMS and without the natural gas train, gas piping & gas flow meters
- 2 x 300 HP, 125 PSIG operating pressure, Natural Gas/# 2 oil fired English firetube boilers model EBFT-300-150-GO-4PW with standard trim and Forney or IC low nox burners with Fireye BMS and without the natural gas train, gas piping & gas flow meters
- 1 x 50,000 Lbs/hr Moss Deaerator for the 2 x 700 HP boilers with 3 x 100% Goulds or Grundfoss Feedwater pumps.
- 1 x 25,000 Lbs/hr Moss Deaerator for the 2 x 300 HP boilers with 3 x 100% Goulds or Grundfoss Feedwater pumps.
- 2 English Blowdown separators and trim with blowdown heat recovery exchangers (one each for the 700 HP system and 300 HP system)
- 2 Twin Aqua System water softeners with brine tanks (one each for the 700 HP system and 300 HP system)
- 2 Economizers, Cannon model FJ8 or equivalent for the 700 HP boilers only
- 2 sets of Hayes Cleveland controls with interface to delta-V system (plant DCS) supplied by the owner. (See below for detailed controls scope of supply)
- 2 Automatic continuous blowdown system with control valves, actuators, conductivity meters and sample coolers
- 4 x 10' tall carbon steel stub stacks (one for each boiler)
- 4 sets FGR pipe and damper (one for each boiler)
- 4 sets of platforms and ladders to access the valves on top of the boiler
- 2 x 8" steam stop valve and 2 x 8" steam NRVs for the 700 HP boilers
- 2 x 6" steam stop valve and 2 x 6" steam NRVs for the 300 HP boilers
- ASME spool pieces between stop valves and NRV
- Main steam piping up to the edge of the skid
- 2 sets of bench, sink and safety shower
- 4 prefabricated, insulated boiler house modules (2 modules per site) with rollup doors/ double doors, louvers, exhaust fans, fluorescent lights and space heaters. (Please refer to the preliminary layout drawings for the module arrangement and dimensions)
- Piping inside the boiler house modules
- Wiring inside the boiler house modules
- Pipe insulation inside the boiler house modules
- Field installation of the modules, interconnecting piping and wiring between the modules (Foundation and other civil work are by others)
- 24 days of startup and training total (12 days for each site) is quoted as optional extra. Additional days can be purchased at prevailing English Boiler's standard per diem rate.

## Boiler Controls Description:

There are common sets of requirements for both locations. They are:

- Provide full automatic control of the boilers and the firing rates for single point positioning control by lead lag control.
- Monitor and display natural gas flow, oil flow and steam flow for each boiler as well as the main steam flow rate.
- Provide an optional O2 trim control system.
- Provide for communications from the controllers and the data logging system for the communications with the plant's system.

In addition to those requirements our offer will include the capability to determine boiler efficiency based on the boiler steam flow and the fuel flow rates.

We are providing the following major equipment for meeting these objectives and to provide the facility with the means of determining boiler efficiency.

Base System: Boiler Automatic Lead Lag Sequencer, Flow Computer & Boiler Efficiency Computer

The lead lag system is a UL approved system, Hays Cleveland's PLC based Compact Micro IV™ for automating the boilers to meet the load demands. The flow and efficiency instrument is Hays Cleveland's AC Station, UL approved controller. This same model shall be used for the optional O2 trim system.

| ITEM | QTY | DESCRIPTION |
|------|-----|-------------|
| A | 2 | Boiler master and lead lag sequencer for each system. The Compact Micro IV™ will be supplied, Model C-05830-A0-A02yy-F02. The controller includes the output of 0 to 135 ohm to the actuator supplied by the burner company. Modbus communications, boiler on/off/auto switch and boiler on light are provided. UL approved. |
| B | 2 | Flow and Efficiency computer, AC Station Model, AC30-3000, UL approved with 8 analog and 8 digital inputs standard. The instrument will power the transmitted inputs and will display the following:<br>○ Boiler steam flow rates, 2, and totals.<br>○ Main header steam flow rate and total.<br>○ Natural gas flow rates, 2, and totals.<br>○ Oil flow rate, 2, and totals.<br>○ Boiler efficiency % for each boiler based on the boiler steam flow rate and the fuel flow rate. |
| C | 2 | Main steam header pressure transmitters, Model IGP10-A as input to Item A. |
| D |  | Intentionally Left Blank. |
| E | 4 | Oil flow meters with meter mounted flow indicator and 4-20 mADC output to Item B, Great Plains Model GM005 oval gear meter. |
| F | 4 | Boiler and main steam flow transmitters, Model IDP10-A with 4-20 |

## STEAM BOILERS:
Standard features of English firetube boilers:

- Four pass wet back design
- Standard boiler trim (see table below for trim list)
- Package unit listed by Underwriters Laboratories
- ASME Stamped pressure vessel
- Davited, insulated, gasketed, and bolted front doors
- Hinged, insulated, and gasketed rear doors
- 2 inch mineral wool insulation and 22 BWG gauge galvanized and painted steel metal jacket
- Structural steel skid-type base frame
- Burner mounting plate and refractory

## Standard Boiler Trim (for each boiler):

| Qty. | Description | Service |
|---|---|---|
| 1 | McDonnell & Miller water level control, including blow down valve. | Low Water Cut-off and alarm Terminals. |
| 2 | United water level block valves set with ball valve for blow off | Glass gauge block valves. |
| 1 | Corning water level glass gauge, red line type 5/8" Diameter. | Water level gauge. |
| 3 | United tricocks valves. | Water level test. |
| 1 | Warrick electrode fitting and electrode, 3E2B model, 2" NPT. | Probe type auxiliary low level cutoff. |
| 3 | Kunkle steam side outlet safety valves | Steam safety valves. |
| 1 | 6" Ashcroft steam pressure gauge, 0 – 400 psig range. Including shut off valve and test valve. | Steam pressure gauge. |
| 1 | Everlasting quick opening valve, lever operated, figure 4000-A, 2" NPT. | Quick opening blow-down. |
| 2 | United " Y " type blow-down valves, 225 UT model, 2" NPT. | Slow blow-down. |
| 1 | 3000 psig Fittings.Set. | To mount and pipe the above controls and valves. |
| 1 | Schedule 80 piping set. | To mount and pipe the above controls and valves. |

Component manufacturers are subject to possible change during project execution phase. EBT may substitute other manufacturers of equal quality as required to meet code and shipment requirements.

-17-

| F | 4 | Boiler and main steam flow transmitters, Model IDP10-A with 4-20 mADC output to Item B. |
| G | 6 sets | Orifice plate and flanges for boiler and main steam flow rates. |
| H | 2 | Control cabinets for Items A & B, surface mount type, approximate dimensions are 36" wide X 36" long X 24" deep. |

## Price:

Lump sum price for the turnkey project per scope described above: **$1,507,640** (One million five hundred seven thousand six hundred and forty dollars) F.O.B. jobsite - Bristol, PA.

24 days of startup and training total (12 days for each site): **$38,400**

English Boiler will provide a Letter of Credit to Vestar for an amount of $300,000.

## Submittals:

Submittal drawings for the boilers and boiler accessories shall be submitted within six (6) weeks after receipt and acceptance of order. For our schedule, we estimate an additional two (2) weeks of approval time after customer receipt of submittals.

## Fabrication and Delivery:

Fabrication of the unit does not begin until the receipt of a formal release for fabrication by the buyer. Shipment is anticipated twenty (20) to twenty-two (22) weeks after receipt formal release for fabrication.

Availability of times stated above is based on current in house schedule. Above times may vary at time of order placement, due to in house workload and material availability. Firm dates will be negotiated when order is placed.

The new boiler will be transported by motor freight. All loose ancillary components will be shipped via motor freight.

## Payment Terms:

| 15% | @ received with receipt of order |
| 25% | @ issue of submittal drawings (net 30) |
| 25% | @ receipt of boiler shell materials at plant (net 30) |
| 25% | @ notification of readiness to ship (net 30) |
| 10% | @ with acceptance not to exceed 60 days from ship date (net 30) |

## Clarifications:

1. For #2 oil firing Nox level of less than 90 PPM and CO less than 100 PPM is guaranteed based on a fuel oil with a Nitrogen content of less than 0.015 and using steam atomization in lieu of air atomization.
2. Land preparation, foundations, sumps, sump pumps (lifting station), construction and other permits, removal of contaminated soil and building materials and any other work outside of the boiler house modules are not by English Boiler.
3. Chemical feed systems with metering pumps are not by English Boiler

## Standard Vendors List:

English Boiler typically utilizes key components supplied by the following vendors.

**Burners**
- Bloom Engineering
- Coen
- Faber
- Forney Corporation
- Gordon-Piatt Group
- Industrial Combustion
- Peabody
- Todd Combustion

**Forced Draft Fans**
- Chicago Blower
- Robinson
- New York Blower

**Air Dampers**
- Effox
- Mader

**Combustion Controls & Instruments**
- Allen Bradley
- Ashcroft
- Bailey
- Beck
- Coen
- Dwyer
- Fireye
- Hayes Cleveland
- Honeywell
- Maxon
- Moore
- Preferred Instruments
- Todd Combustion
- Rosemont
- Yokogawa

**Trim and Valves**
- Crane
- Crosby
- Clark Reliance
- Edwards
- Everlasting
- Kitz
- McDonnell Miller
- Newco
- Newman
- RPC
- Vogt

**Economizers**
- Applied Thermal
- Cannon Boiler Works
- English Boiler
- Kentube

**Stacks**
- IES
- Selkirk Metabestos
- Schebler
- Warren
- Van Packer

**Feedwater Control Valves**
- Copes Vulcan
- Fisher
- Jordan

**Sootblowers**
- Diamond Power
- Clyde Bergemann

## Factory Assembled Boiler Feedwater System

A complete shop assembled boiler feedwater system shall be supplied for this project. English Boiler & Tube will shop-fabricate the system on a fabricated steel base frame supplied to the jobsite as a complete assembly. The enclosure shall match the appearance of that supplied for the two boiler modules. The basic requirements are the same as for the boiler modules. All interconnecting piping and wiring shall be installed as required. All wiring shall be routed in hard conduit; all piping shall be insulated as applicable. Multiple electrical receptacles shall be factory installed. All equipment required for the operation of the boiler and included in the specification shall be shop installed on the boiler skid. This skid shall connect to similar openings on the boiler.

The major components to be supplied include as follows:

- Deaerator with Three boiler feedpumps (3X 100% MCR)
- Blowdown separator with heat exchanger
- Water Softener, brine system.
- Chemical feed system (supplied by others)

**Deaerator Boiler Feedwater Pumps**

A packaged deaerator shall be provided to deliver feedwater to the boiler(s) with oxygen content of no more than 0.05 cc/l and eliminate free carbon dioxide over all load conditions 5% to 100%.  The unit will be of a spray-type configuration sized to provide flow to both boilers operating at full capacity based on a 100% make-up with wate. The unit shall typically operate at 5 psig, but shall be suitable for use from 2 to 15 psig.

The boiler feedwater pump system shall be based on the supply of three total pumps, with each pump suitable for satisfying the complete demand of each boiler and the third pump providing 100% redundancy. Each pump shall be supplied with a seal suitable for the application.  Pumps shall not cavitate or run in overload beyond the motor nameplate rating. Each pump shall be equipped with inlet and outlet isolation valves, suction strainers, discharge pressure gauge and non-slam type check valve.  Each pump shall be supplied as a complete unit with TEFC high efficiency motor with baseplate and coupling.

**Blowdown Separator:**

A blowdown separator sized for the application shall be installed.  A heat recovery exchanger is included.

**Softeners:**
The softener system will be shipped as a skid assembled unit including factory pre-assembled unit piping, internal piping, interconnecting piping, valves, controls and solenoid valves all assembled on a structural steel skid

**Weather Enclosures:**

Both boilers and the feedwater assembly shall be supplied in enclosures. This will eliminate the need to erect a building at the site for the boiler and feedwater system. It is the intention of English Boiler to supply a system that will provide a minimal amount of site erection work.

English Boiler shall provide a weather tight and insulated enclosure for the front of the boiler. This picture shows an English boiler with a weather enclosure similar to what has been proposed for this project. The enclosure shall be provided with doors, air louvers, and internal lighting. The enclosure will be suitable for man-access and will include space heaters. All wiring and piping inside of the enclosure will be provided shop assembled.

8/1/2008 at 11:30 AM

# English Boiler and Tube Inc.
## Customer Ledgers
### For the Period From Jan 7, 2004 to Apr 7, 2008

Filter Criteria includes: 1) IDs: 24-37. Report order is by ID. Report is prime

## Vestar - (Optimira Energy) customer 24-37

| Date | Inv# | Type | Debit Amt | Credit Amt | Balance |
|---|---|---|---|---|---|
| 6/23/04 | 7034 | SJ | 226,146.00 | | 226,146.00 15% on issue of PO |
| 6/23/04 | 7035 | SJ | 376,910.00 | | 603,056.00 25%-submittal drawings |
| 7/14/04 | 7034 | CRJ | | 226,146.00 | 376,910.00 |
| 7/28/04 | 7051 | SJ | 376,910.00 | | 753,820.00 25% -materials at plant |
| 8/20/04 | 7035 | CRJ | | 376,910.00 | 376,910.00 |
| 9/2/04 | 7051 | CRJ | | 376,910.00 | 0.00 |
| 2/15/05 | 7136 | CRJ | | 188,455.00 | 188,455.00 |
| 2/17/05 | 7136 | SJ | | | -188,455.00 |
| 3/9/05 | 7136 | SJ | 376,910.00 | | 188,455.00 25%-notice to ship |
| 3/9/05 | 7174 | SJ | 6,700.00 | | 195,155.00 change order 1 |
| 3/9/05 | 7175 | SJ | 8,200.00 | | 203,355.00 change order 2 |
| 3/9/05 | 7176 | SJ | 3,100.00 | | 206,455.00 change order 3 |
| 3/22/05 | 7136 | CRJ | | 188,455.00 | 18,000.00 |
| 4/18/05 | 7174/75/76 | CRJ | | 18,000.00 | 0.00 |
| subtotal | | | 1,374,876.00 | 1,374,876.00 | At this point, all invoices were paid in full. |
| 5/31/05 | 7231 | SJ | 150,764.00 | | 150,764.00 10% - upon acceptance |
| 6/9/05 | 7242 | SJ | 38,400.00 | | 189,164.00 Start up services |
| 7/16/07 | CR7231 | SJ | | 150,764.00 | 38,400.00 bad debt |



PLAINTIFF'S EXHIBIT 2

Blumberg No. 5113

English Boiler and Tube Inc.
Customer Ledgers
For the Period From Jan 7, 2004 to Apr 7, 2008

Filter Criteria includes: 1) IDs: 24-37. Report order is by ID. Report is printe

| Date | Inv# | Type | Debit Amt | Credit Amt | Balance | |
|------|------|------|-----------|------------|---------|---|
| 7/16/07 | CR7242 | SJ | | 38,400.00 | 0.00 bad debt | |
| 9/4/07 | 7674 | SJ | 45,000.00 | | 45,000.00 agreement | First installment of revised |
| | | | 1,609,040.00 | 1,564,040.00 | 45,000.00 | |



## ENGLISH BOILER & TUBE, INC.
P.O. Box 50218, Richmond, Virginia 23250-0218
Ph: (804) 226-8227 Fax: (804) 226-9321

### Internal Change Order Transmittal #1

**Date:** __August 2, 2004__

**Job #:** _____24-037_____    Customer/Vendor:  __Vestar/Cinergy__

**P.O. # being amended:** _____1ROH_____

**Reason for Change:** _____

> Customer requested larger brine tanks than what was originally offered.  This adder is the cost of the two tanks, minus the $478 credit for the original 50 x 60 brine tank.  Adder is $2519.87 each tank, or $5,039.74 total.

Original contract amount: =          $  1,507,640.00
**Amount of this change order #: =**     $      6,700.00
Total New Contract amount:=           $  1,514,340.00

Billing directions of change order  (Add to schedule or bill separately)
Backup documentation attached YES/NO.
Customer Approval must be attached.

**Distribution sign off:**
**Project Manager:**                    _8/2/04_

**Director of Project Manager:**        _8/3/04_

**VP of Operations:**

**Accounting:**

**General Manager**

#1


PLAINTIFF'S
EXHIBIT
3



## ENGLISH BOILER & TUBE, INC.
### P.O. Box 50218, Richmond, Virginia 23250-0218
### Ph: (804) 226-8227 Fax: (804) 226-9321

### Internal Change Order Transmittal #2

**Date:** __August 9, 2004__

**Job #:** _____24-037_____    **Customer/Vendor:**  **Vestar/Cinergy**

**P.O. # being amended:** _____1ROH_____

**Reason for Change:**

Customer requested 22" manway on deaerators, all flanged connections on dearators, and move control panels to side.

| | | |
|---|---|---|
| Original contract amount | = | $  1,507,640.00 |
| Change Order #1 | = | $        6,700.00 |
| **Amount of this change order #: =** | | $        8,200.00 |
| **Total New Contract amount:=** | | $  1,522,540.00 |

**Billing directions of change order  (Add to schedule or bill separately)**
**Backup documentation attached  YES/NO.**
**Customer Approval must be attached.**

**Distribution sign off:**
**Project Manager:**                     _8/9/04_

**Director of Project Manager:**          _8/9_

**VP of Operations:**

**Accounting:**

**General Manager**

#2

PLAINTIFF'S
EXHIBIT
4
Blumberg No. 5113



## ENGLISH

### ENGLISH BOILER & TUBE, INC.
P.O. Box 50218, Richmond, Virginia 23250-0218
Ph: (804) 226-8227 Fax: (804) 226-9321

### Internal Change Order Transmittal #3

**Date:  August 31, 2004**

**Job #:**            24-037            **Customer/Vendor:   Vestar/Cinergy**

**P.O. # being amended:          1ROH**

**Reason for Change:**

Customer requests automated mud drum blowdown valves on each boiler at a cost adder of $775 per boiler.  Valves are $475 each from Flowserve and include integral timer assemblies.

| | | | |
|---|---|---|---|
| Original contract amount | = | $ | 1,507,640.00 |
| Change Order #1 | = | $ | 6,700.00 |
| Change Order #2 | = | $ | 8,200.00 |
| **Amount of this change order #: =** | | $ | 3,100.00 |
| **Total New Contract amount:=** | | $ | 1,525,640.00 |

**Billing directions of change order  (Add to schedule or bill separately)**
**Backup documentation attached  YES/NO.**
**Customer Approval must be attached.**

**Distribution sign off:**
**Project Manager:**                                    8/31/04

**Director of Project Manager:**          H. McClelland  8/31/04

**VP of Operations:**          JHH for Rich English  9/13/04

**Accounting:**

**General Manager**          JHH for T. English  9/13/04

#3

PLAINTIFF'S
EXHIBIT
5
Blumberg No. 5113

## SETTLEMENT AND MUTUAL RELEASE AGREEMENT

This Settlement and Mutual Release Agreement (this "Agreement") is entered into by and between Optimira Energy, Inc., a Delaware corporation formerly known as Cinergy Solutions-Demand, Inc. (Optimira"), and English Boiler & Tube, Inc., a Virginia corporation ("English Boiler") as of the 1st day of October 2006. Optimira and English Boiler are sometimes hereinafter referred to as a "Party" or collectively as the "Parties."

WHEREAS, Optimira and English Boiler are parties to that certain Agreement, dated as of June 1, 2004 (the "2004 Agreement"), pursuant to which English Boiler and Tube Inc. agreed to provide certain services and products to Optimira with respect to the contract between Optimira (then called Vestar, Inc.) and Rohm and Haas contract dated June 1, 2004.

NOW THEREFORE, in consideration for the mutual promises contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, and in order to avoid delay and litigation, the Parties agree as follows:

1.    Mutual Release.  The Parties waive, release, and covenant not to file any actions in any court, administrative agency, or otherwise, with respect to any matters related to or arising out of the 2004 Agreement and each Party, for itself, its affiliates, its successors and assigns, and all other entities obtaining any rights through or from them, except as set forth in Section 3 below, hereby waives, releases, acquits, and forever discharges the other Party, including the other Party's board of directors, agents, successors, partners, members, associates, officers, directors, affiliates, employees, and former partners, associates, officers and directors, and any other person or entities acting on their behalf, from any and all claims, causes of action, actions, damages, losses, costs, expenses, contracts, debts, complaints, suits, agreements, duties and obligations, or claims of any kind (collectively, "Claims") that each Party or its successors and assigns, agents, affiliates, or any other persons or entities acting on its behalf, or other entities obtaining any rights through or from them, have or have had against the other Party, up to and including the date of this Agreement, including, but not limited to, those now existing or hereafter occurring arising out of or related to the 2004 Agreement, known or unknown, foreseen or unforeseen.

2.    Waiver of Unknown Claims.  It is a further condition of the consideration hereof and it is the intention of the Parties in executing this Agreement that, except as specifically provided in Section 3, this Agreement shall be effective as a bar to each and every Claim that a Party may have as of the date hereof against the other Party, relating or connected to, or arising out of the 2004 Agreement.  In furtherance of this intention and to the extent allowed by law, the Parties hereto hereby expressly waive any and all rights or benefits conferred by any statute or law or other provision that otherwise limits the release of Claims by a person or entity that are not known or suspected to exist in such person's or entity's favor at the time of executing the release and, which, if known or suspected, would have materially affected such person's or entity's decision whether or not to enter such release.  The Parties acknowledge and agree that they may hereafter discover Claims or facts in addition to or different from those that they now know or believe to exist with respect to the subject matter of this Agreement and which, if known or suspected at the time of



PLAINTIFF'S EXHIBIT
6

executing this Agreement, may have materially affected this settlement. Nevertheless, the Parties expressly accept and assume the risk of such possible differences in fact and agree that, except as set forth in Section 3, this Agreement shall be and remain effective, notwithstanding any such differences, and hereby waive any rights or Claims that might arise as a result of such different or additional Claims or facts. The Parties acknowledge that they understand the significance and potential consequence of such a release of unknown Claims. Each Party states that this Agreement is executed voluntarily by it with full knowledge of its significance and legal effect. The Parties intend that the Claims released by it under this Agreement be construed as broadly as possible, subject to the terms and conditions contained in this Agreement.

3.    <u>Unreleased Claims</u>. Notwithstanding anything else to the contrary, the releases set forth in Section 1 and 2 above shall not operate to discharge the Parties or their respective sureties of: (a) their obligations under this Agreement; (b) their obligations with respect to remaining punchlist work under the 2004 Agreement; (c) their obligations to rectify latent defects in the work materials or equipment provided under the 2004 Agreement; and (d) their obligations with respect to any other responsibilities which survive under the 2004 Agreement, including, but not limited to, any breach of any warranty, express or implied. Nor shall the above releases prevent the Parties from asserting claims or actions to enforce this Agreement. Further, the releases shall not apply to instances where suit is brought against Optimira by a third party as a result of acts and or omissions for which English Boiler may be, in whole or in part, responsible, such as Claims for personal injury or property damage covered by insurance.

4.    <u>Payments to English Boiler</u>. In consideration of the above release by English Boiler, Optimira shall make the following payments to English Boiler:

(i)    Upon the execution and delivery of this Agreement, the sum of Five Thousand Dollars ($5,000);

(ii)    On or before the first anniversary of the execution and delivery of this Agreement, the sum of Forty-five Thousand Dollars ($45,000);

(iii)    On or before the second anniversary of the execution and delivery of this Agreement, the sum of Fifty Thousand Dollars ($50,000); and

(iii)    On or before the third anniversary of the execution and delivery of this Agreement, the sum of Fifty Thousand Dollars ($50,000).

The Parties recognize that such payments are made to settle a disputed claim, and shall not be not be construed as an admission of any liability on the part of Optimira.

5.    <u>No Construction against any Party; No Assignment of Claims</u>. Each Party (a) has carefully read the Agreement, knows and understands the contents of this Agreement and executes this Agreement freely, (b) has received independent legal advice from attorneys of its own choice with respect to the advisability of executing this Agreement, or has been afforded the opportunity to consult with attorneys of its own choice and has voluntarily, knowingly and freely waived this right, and (c) acknowledges and agrees that this Agreement is the result of negotiation between the Parties, and that the terms of this Agreement shall not be construed or interpreted against either

2

DC #234635 v1

Party in the event of any dispute arising between them in connection with it based on the identity of the drafter. Each Party represents that it has not heretofore assigned or transferred, or purported to assign or transfer, to any person, corporation or other entity, any Claim released hereunder, and each such Party shall indemnify and hold harmless the other Party against any liability, loss, damage, cost or expense (including reasonable attorneys' fees) arising out of any breach of this representation and warranty.

6.    Further Assurances. The Parties agree to execute all documents and to take all other actions necessary to effectuate this Agreement.

7.    Governing Law; Jurisdiction. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to principles of conflicts of law, other than Sections 5-1401 and 5-1402 of the New York General Obligations Law. The exclusive venue and jurisdiction for any action or suit related to or arising out of this Agreement shall be in the Federal court located in the Borough of Manhattan in The City of New York, or if such court lacks or declines jurisdiction for any reason, the courts of the State of New York located in the Borough of Manhattan in The City of New York. Each Party hereby: (a) consents to submit itself to the personal jurisdiction of the Federal and state courts located in the Borough of Manhattan in The City of New York in the event any dispute arises out of this Agreement or any of the transactions contemplated by this Agreement, (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it shall not bring any action relating to this Agreement or any of the transactions contemplated herein in any other court other than a Federal or state court sitting in the Borough of Manhattan in the City of New York.

8.    Notices. Any notice, statement, demand, claim, offer or other written instrument required or permitted to be given pursuant to this Agreement shall be in writing signed by the Party giving such notice and shall be sent by facsimile, hand messenger delivery, overnight courier service, or certified mail (receipt requested) to the other Party at the address set forth below:

To Optimira:                 Optimira Energy, Inc.
                             60 East 42nd Street
                             Suite 3405
                             New York, New York 10017
                             Attention: Mr. Stephen H. Clevett
                             Facsimile No. (508) 881-2879 — Disconnected
                                                  839-1100

With a copy to:              → Grafton, MA
                             — Richard McCarthy —

                             Thelen Reid & Priest LLP
                             701 Eighth St., NW
                             Washington, DC 20001-3721
                             Attention: Kenneth B. Weiner, Esq.
                             Facsimile: (202) 654-1801    202-508-3989

To English Boiler:           English Boiler & Tube, Inc.
                             P.O. Box 50218

3

DC #234635 v1
202-508-4347

Richmond, Virginia 23250
ATTN: Rick English
Facsimile: (804) 226-9321

With a copy to:            Christopher M. Malone, Esquire
                           Thompson & McMullan, P.C.
                           100 Shockoe Slip
                           Richmond, Virginia 23219
                           Facsimile: (804) 780-1813

Each Party shall have the right to change the place to which notices shall be sent or delivered or to specify one additional address to which copies of notices may be sent, in either case by similar notice sent or delivered in like manner to the other Party. All notices shall be effective upon receipt.

   9.    Amendment and Wavier. This Agreement may not be altered or modified without the express written consent of the Parties. No course of conduct shall constitute a waiver of any of the terms and conditions of this Agreement, unless such waiver is specified in writing, and then only to the extent so specified. A waiver of any of the terms and conditions of this Agreement on one occasion shall not constitute a waiver of the other terms of this Agreement, or of such terms and conditions on any other occasion. Any attempted oral modification of this Agreement shall be void and of no force or effect.

   10.   Section Headings. The section headings, titles and subtitles used in this Agreement are solely for convenience and shall not be used in interpreting this Agreement, and shall not be construed in any way to limit, modify or affect the terms of this Agreement.

   11.   Severability. If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced under applicable law, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated herein are not affected in any manner adverse to any Party. Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated herein are consummated as originally contemplated to the fullest extent possible.

   12.   Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Party. Any counterpart may be executed by facsimile signature or any image transmitted by electronic mail (such as a pdf file) and such facsimile signature or image shall be deemed an original.

   IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date first written above.

4

DC #234635 v1

ENGLISH BOILER & TUBE, INC.                OPTIMIRA ENERGY, INC.

By: _____            By: _____
    Name: RICHARD E. ENGLISH                  Stephen H. Clevett
    Title: VICE PRESIDENT                      President and CEO

5

DC #234635 v1

ENGLISH BOILER & TUBE, INC
P O BOX 50218
RICHMOND  VA  23250-0218

# INVOICE

| | |
|---|---|
| Invoice Number: | 7674 |
| Invoice Date: | Sep 4, 2007 |
| Page: | 1 |

Voice:   804-226-8227

Fax:     804-236-2919

**Bill To:**

OPTIMIRA ENERGY, INC
60 EAST 42nd ST
SUITE 3405
NEW YORK, NY  11007

**Ship to:**

OPTIMIRA ENERGY, INC
60 EAST 42nd ST
SUITE 3405
NEW YORK, NY  11007

| Customer ID | Customer PO | Payment Terms | |
|---|---|---|---|
| 24-37 | | Net 30 Days | |
| **Cust Contact** | **Cust Fax** | **AP Contact** | **Due Date** |
| | | | 10/4/07 |

| Quantity | Description | Unit Price | Amount |
|---|---|---|---|
| 1.00 | DUE UPON FIRST ANNIVERSARY OF SETTLEMENT AGREEMENT | 45,000.00 | 45,000.00 |
| | DATED 10/1/06 | | |
| | DUE UPON SECOND ANNIVERSARY OF SETTLEMENT | 50,000.00 | |
| | AGREEMENT DATED 10/1/06 | | |
| | DUE UPON THIRD ANNIVERSARY OF SETTLEMENT AGREEMENT | 50,000.00 | |
| | DATED 10/01/06 | | |

Check/Credit Memo No:

| | |
|---|---|
| Subtotal | 45,000.00 |
| Sales Tax | |
| Total Invoice Amount | 45,000.00 |
| Payment/Credit Applied | |
| TOTAL | 45,000.00 |



PLAINTIFF'S
EXHIBIT

7

# *Thompson* McMullan
### A PROFESSIONAL CORPORATION

**Sarah B. Warner**
Direct Dial: (804) 698-5922
Facsimile: (804) 780-1813
E-mail: swarner@t-mlaw.com

*100 Shockoe Slip   Richmond, Virginia 23219-4140*
*Telephone:* (804)649-7545   *Website:* WWW.T-MLAW.COM

November 20, 2007

Stephen H. Clevett
Optimira Energy, Inc.
180 Atlantic Street
Hackensack, NJ 07601

   Re: Payment Under the Settlement and Mutual Release Agreement

Dear Mr. Clevett:

   I represent the interests of English Boiler & Tube, Inc. with respect to various matters. In that regard, I have been notified that Optimira Energy, Inc. ("Optimira") has failed to make the second payment of Forty-five Thousand No/100 ($45,000.00) as required by the Settlement and Mutual Release Agreement dated October 1, 2006. Payment was due on or before October 1, 2007. As a result of Optimira's failure to pay as scheduled, Optimira is in default of the Settlement and Mutual Release Agreement and all funds under the agreement are now due. In the event full payment of One Hundred and Forty-five Thousand No/100 ($145,000.00) is not made on or before December 15, 2007, I will take all appropriate steps to ensure the rights of English Boiler & Tube are protected. I look forward to hearing from you.

   Sincerely,

   *Sarah Warner*

   Sarah B. Warner

SBW/kj

cc: Anne Spicer
  Kenneth B. Weiner

